IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JONATHAN F. HARRIS,                         :
                                            :
                        Petitioner,         :        CIVIL ACTION NO. 17-5584
                                            :
        v.                                  :
                                            :
MARK GARMON,                                :
                                            :
                        Respondent.         :

## **MEMORANDUM OPINION**

Smith, J.                                                        February 15, 2022

The *pro se* petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from his 2007 convictions for third-degree murder, conspiracy, and possession of an instrument of crime after a jury trial in the Court of Common Pleas of Philadelphia County. The petitioner generally contends that he is entitled to habeas relief because (1) the prosecutor committed prosecutorial misconduct in the introduction of his closing argument when he referenced the war in Iraq and the killing of individuals on the streets of Philadelphia, and (2) his direct appellate counsel was ineffective when counsel failed to include a claim that the trial court erred when it did not permit the petitioner to read in a portion of his testimony from a prior trial after the prosecutor indicated that he was going to read some of this prior testimony as rebuttal evidence.

The magistrate judge issued a comprehensive report and recommendation in which he recommended that the court deny the habeas petition. The petitioner has filed numerous objections to this report and recommendation. As discussed below, none of the objections have merit. As such, the court will overrule the objections, approve and adopt the report and recommendation (except for one minor modification referenced in this opinion), and deny the habeas petition and any amendments thereto.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This federal habeas matter arises out of a September 2001 shooting in Philadelphia which eventually resulted in the arrest of the *pro se* petitioner, Jonathan F. Harris ("Harris").[1] Regarding this shooting,

> [t]he Commonwealth alleged that [Harris], a.k.a. "Johnny Cane," and his coconspirator, Shaun "Boo" Cherry, confronted victims Leon Bryant and Joseph "Mackie" Pratt outside the Gold Coast bar in West Philadelphia during the early morning hours of September 23, 2001. [Harris] believed that Pratt had sucker-punched his friend. He approached Bryant's vehicle, where Bryant sat in the driver's seat and Pratt sat in the passenger seat. After a brief verbal exchange, [Harris] jumped on top of the hood of the car and fired numerous shots from a .357–caliber semiautomatic handgun into the vehicle. Simultaneously, Cherry fired his .45–caliber semiautomatic handgun at the vehicle from the side. Seven shots struck Bryant. The vehicle rolled slowly down Lancaster Avenue until a witness, Antwain Ball, reached into the vehicle and turned off the engine. Ball and his sister tried unsuccessfully to speak with Bryant but he soon lost consciousness. Bryant was pronounced dead upon his arrival at the hospital. Both Cherry and Pratt were shot and killed in separate incidents before they were questioned by police regarding this shooting.

*Commonwealth v. Harris*, No. 357 EDA 2013, 2014 WL 10962349, at *1 (Pa. Super. Apr. 15, 2014) ("*Harris II*").

This shooting incident resulted in Harris being tried three times in the Court of Common Pleas of Philadelphia County.[2] The first trial occurred in August 2003, where Harris was tried before a jury "for the murder of Bryant, the attempted murder of Pratt, and several other lesser crimes including possessing an instrument of crime (PIC), recklessly endangering Pratt (REAP), and criminal conspiracy."[3] *Id.* Harris represented himself during this trial, although he did have

---

[1] As explained later in this opinion, this court referred this matter to United States Magistrate Judge Richard A. Lloret for a report and recommendation. *See* Doc. No. 5. Judge Lloret issued a report and recommendation in which he thoroughly set forth the factual and procedural history in this matter. *See* R. & R. at 3–6, Doc. No. 23. Harris did not object to Judge Lloret's factual and procedural history. *See generally* Obj. to R. & R., Doc. No. 25. As such, the court adopts and incorporates Judge Lloret's factual and procedural summary into this opinion. The court will nonetheless recite some of the factual and procedural history insofar as necessary for the analysis in this opinion.
[2] Harris's criminal action is docketed at No. CP-51-CR-409431-2002.
[3] The Honorable James Albert Lineberger, now deceased, presided over this trial.

2

the benefit of standby counsel. *Id.* At the conclusion of the trial, although the jury acquitted Harris of first-degree murder and voluntary manslaughter, it was unable to reach a unanimous verdict as to the remaining charges. *Id.* As such, the trial court declared a mistrial. *See Commonwealth v. Harris*, 979 A.2d 387, 390 (Pa. Super. 2009) ("*Harris I*").

Harris's second trial occurred in December 2003. *See id.* As with the first trial, Harris represented himself with the assistance of standby counsel. *See Harris II* at *1. At the conclusion of this second trial, the jury (1) convicted Harris of PIC and criminal conspiracy, (2) acquitted him of REAP, and (3) deadlocked on third degree murder. *See id.* The trial court later sentenced Harris to two and a half to five years' incarceration on the PIC conviction and a consecutive ten to 20 years' incarceration on the criminal conspiracy conviction.[4] *See id.* The trial court also granted the Commonwealth's motion to *nolle pros* the third-degree murder charge. *See id.*

Harris appealed from his conviction and sentence to the Superior Court of Pennsylvania, and, with the assistance of counsel, argued on appeal that the trial court erred in permitting him to proceed *pro se* at trial without first conducting a full colloquy. *See id.* The Superior Court agreed that the trial court's colloquy was inadequate, vacated the judgment of sentence, and remanded the matter for a new trial in September 2005.[5] *See id.*

Harris's third jury trial occurred in January 2007. *See id.* at *2. Prior to the trial commencing, the Commonwealth moved to withdraw the *nolle pros* of the third-degree murder charge, and the trial court granted that motion and reinstated this charge. *See id.* at *1. This reinstated charge and the charges of PIC and criminal conspiracy were the charges at issue for this third trial. *See id.* at *2.

---

[4] The Honorable Renee Cardwell Hughes, now retired, presided over the second trial and sentenced Harris. *See Harris I* at 390.

[5] The Superior Court's opinion is attached to appendix I to the respondents' response in opposition to Harris's habeas petition. *See* Doc. No. 16 at ECF pp. 133–41.

As with the first two trials, Harris represented himself during the third trial. *See Harris I* at 390. At the conclusion of the trial, the jury convicted Harris of third-degree murder, criminal conspiracy, and PIC. *See id.* The trial court later sentenced Harris to 20 to 40 years' incarceration for third-degree murder, a consecutive 20 to 40 years' incarceration for criminal conspiracy, and a consecutive two and one half to five years for PIC. *See id.* Thus, the total aggregate sentence was a minimum of 42 ½ years to a maximum 85 years' incarceration.

Harris filed a *pro se* appeal from his judgment of sentence, and the Superior Court remanded the case for the trial court to appoint counsel to represent Harris on appeal. *See Harris I* at 390 n.1; *see also* Docket, *Commonwealth v. Harris*, No. CP-51-CR-409431-2002 (Philadelphia Cty. Ct. Com. Pl.). The trial court appointed counsel to represent Harris, and through counsel, Harris raised seven issues on appeal:

> 1. Did the trial court err in denying the defendant's motion for recusal without a hearing?
>
> 2. Did the trial court err in failing to properly instruct the jury as to mere presence?
>
> 3. Did the trial court err in allowing the prosecution to read the defendant's prior testimony concerning Joseph Pratt?
>
> 4. Did the trial court err in repeatedly interrupting the defendant's pro se closing argument?
>
> 5. Did the court err in lifting the nolle prosequi without a hearing?
>
> 6. Did the prosecutor engage in misconduct during his closing argument?
>
> 7. Did the trial court err in allowing the prosecutor to introduce portions of the bail motion as an admission of guilt?

*Harris I* at 390–91.

The Superior Court rejected Harris's claims and affirmed his judgment of sentence on August 11, 2009. *See generally id.* Although Harris initially filed a petition for allowance of appeal

with the Pennsylvania Supreme Court, he withdrew the petition before the Court decided it. *See Harris II* at *2; *see also* Docket, *Commonwealth v. Harris*, No. 516 EAL 2009 (Pa.), *available at*: https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=516%20EAL%202009&dn h=BZh3TfrtPy%2BpbmlpEAZVeA%3D%3D (showing that Harris discontinued action on January 28, 2010).

After concluding his direct appellate challenge to his judgment of sentence, Harris began his collateral attack when he timely filed a petition for post-conviction collateral relief under Pennsylvania's Post Conviction Relief Act, 42 Pa. C.S. § 9541−46 ("PCRA") on March 4, 2010.[6] *See Harris II* at *2. In this petition, Harris raised ineffective assistance of counsel claims relating to his direct appellate counsel. *See id.*

The PCRA court permitted Harris to prosecute his PCRA petition *pro se* and later conducted a hearing which was limited to argument on one of his claims.[7] *See id.* The PCRA court denied Harris's petition via an order entered on January 11, 2013. *See id.* Harris then appealed from that order to the Superior Court, and he raised the following issues on appeal:

> I. WAS APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE [ASSISTANCE OF] COUNSEL, DUE TO APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL THE ISSUE OF COLLATERAL ESTOPPEL PURSUANT TO *ASHE V. SWENSON*[,] DENYING APPELLANT HIS FIFTH AMENDMENT ... DOUBLE JEOPARDY [RIGHT]?
>
> 2. WAS APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE [ASSISTANCE OF] COUNSEL, DUE TO APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL ... THAT APPELLANT WAS DENIED HIS SPEEDY TRIAL RIGHTS?

---

[6] Under the PCRA, "[a]ny petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final[.]" 42 Pa. C.S. § 9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of the time for seeking the review." *Id.* § 9545(b)(3).

[7] During the PCRA proceedings, the matter was reassigned from Judge Hughes to the Honorable Benjamin Lerner due to Judge Hughes's retirement. *See* Docket, *Commonwealth v. Harris*, No. CP-51-CR-409431-2002 (Phila. Cty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0409431-2002&dnh=F7IXYKu9yUJsgpDEwUKWNA%3D%3D.

3. DID THE PCRA COURT ERR BY CONCLUDING THAT THE EVIDENCE WAS OVERWHELMING TO DENY APPELLANT RELIEF THAT HIS DUE PROCESS RIGHTS WERE VIOLATED, WHEN THE TRIAL COURT DENIED APPELLANT THE OPPORTUNITY TO PRESENT PORTIONS OF APPELLANT'S PRIOR TESTIMONY ... [THAT WOULD] ... REBUT THE MISLEADING PORTIONS READ IN BY THE COMMONWEALTH?

4. DID THE PCRA COURT ERR BY FAILING TO ADDRESS APPELLANT'S THIRD AMENDED PETITION?

*Id.* (alterations in original) (citation and internal footnote omitted).

In analyzing these issues, the Superior Court concluded that Harris had waived any issue relating to the PCRA court not addressing his third amended petition for his failure to include it in his Pennsylvania Rule of Appellate Procedure 1925(b) statement. *See id.* at *3. The Superior Court also determined that its review of the PCRA court's denial order was "hindered" by the lack of testimony from Harris's direct appellate counsel. *See id.* As such, the Superior Court vacated the PCRA court's denial order and remanded the case to the PCRA court for a hearing on Harris's ineffective assistance of counsel claims. *See id.*

On remand, the PCRA court held an evidentiary hearing on July 22, 2014, during which Harris's direct appellate counsel testified. *See Commonwealth v. Harris*, No. 2693 EDA 2015, 2016 WL 5266560, at *3 (Pa. Super. July 21, 2016) ("*Harris III*"). The PCRA court then dismissed Harris's PCRA petition for lack of merit on August 20, 2015. *See id.* Harris filed an appeal from the dismissal order to the Superior Court on August 28, 2015. *See id.*

On appeal, Harris raised the following issues:

1. WAS APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL, DUE TO APPELLATE COUNSEL'S FAILURE TO PROPERLY RAISE ON DIRECT APPEAL THE ISSUE OF COLLATERAL ESTOPPEL PURSUANT TO *ASHE V. SWENSON* DENYING APPELLANT HIS FIFTH AMENDMENT RIGHT TO DOUBLE JEOPARDY?

2. WAS APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL, DUE TO APPELLATE COUNSELS FAILURE TO

RAISE ON DIRECT APPEAL, THAT APPELLANT WAS DENIED HIS SPEEDY TRIAL RIGHTS, WHEN THE COMMONWEALTH *NOLLE PROSSE* [sic] THE CHARGE OF THIRD DEGREE MURDER AFTER A MISTRIAL ON THE CHARGE THEN REOPENED IT THREE YEARS LATER?

3. WAS APPELLANT DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL, DUE TO APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL THE TRIAL COURT'S FAILURE TO ALLOW APPELLANT TO READ CERTAIN PORTIONS OF PRIOR TESTIMONY TO REBUT PORTIONS READ BY THE COMMONWEALTH?

4. DID THE PCRA COURT ERR BY FAILING TO CONSIDER THAT IT WAS "GOVERNMENTAL INTERFERENCE" THAT PRECLUDED APPELLANT FROM RAISING IN THE PRIOR 1925(b) THAT IT WAS ERROR FOR THE PCRA COURT TO NOT CONSIDER APPELLANT'S THIRD AMENDED PETITION?

*Id.* (alteration in original) (citation omitted).

The Superior Court affirmed the PCRA court's dismissal of Harris's PCRA petition on July 21, 2016. *See id.* at *9. Harris filed a petition for reargument and reconsideration, which the Superior Court denied on September 22, 2016. *See* Docket, *Commonwealth v. Harris*, No. 2693 EDA 2015 (Pa. Super.), *available at*: https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=2693%20EDA%202015&d nh=%2BbCRSQKqDQE%2BRsrH8sbQaA%3D%3D. Harris then filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which the Court denied on April 18, 2017. *See id.*

After unsuccessfully challenging his convictions and sentence in the state courts, Harris commenced this federal action by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on December 8, 2017.[8] *See* Doc. No. 1. In this petition, Harris included two claims. First, he asserted that his appellate counsel was ineffective for "failing to argue a Rule 106 issue," namely

---

[8] The federal "prisoner mailbox rule" provides that a pro se prisoner's petition is deemed filed "at the time petitioner delivered it to prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 275–76 (1988). Here, Harris included a declaration that he delivered his section 2254 petition to the prison mailing system on December 8, 2017. *See* Doc. No. 1 at ECF p. 15. The court has therefore used December 8, 2017, as the filing date.

that the trial court violated Harris's Fourteenth Amendment due process rights by allowing the prosecutor "to read excerpts from [Harris's] prior trial, and [the trial court only gave Harris] the option to take the stand to rebut the portions read by the prosecutor. Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody at ECF pp. 5, 20, Doc. No. 1. Second, Harris claims that the prosecutor committed prosecutorial misconduct when the prosecutor, in his closing argument to the jury, brought up "the murder rate in Philadelphia, and how people are being killed in the streets of Philadelphia, and compared the war in Iraq to the streets of Philadelphia and the senseless murder in crime." *Id.* at ECF p. 7.

Harris filed a "Rule 7 Motion to Expand the Record" on January 4, 2018,[9] which this court granted on January 10, 2018. *See* Doc. Nos. 3, 4. On January 12, 2018, the court referred this matter to the Honorable Richard A. Lloret for a report and recommendation. *See* Doc. No. 5.

Harris filed a motion to amend his habeas petition on July 6, 2018,[10] which Judge Lloret granted on August 16, 2018. *See* Doc. Nos. 8, 11. Harris then filed an "Amended Petition in Support of Section 2254" on September 14, 2018, which included the request he made in his prior motion to amend.[11] *Compare* Doc. No. 8 (seeking to have the court consider *Brooks v. Gilmore* as part of habeas petition), *with* Doc. No. 13 (same).

---

[9] In this motion, Harris indicated that he wanted the court to consider *Commonwealth v. McClure*, 144 A.3d 970 (Pa. Super. 2016) in support of his "Rule 106 issue" and *Commonwealth v. Vanistendael*, No. 1080 WDA 2016, 2017 WL 3219471 (Pa. Super. July 28, 2017) in support of his "prosecutor misconduct argument." Rule 7 Mot. to Expand the R. at 1, Doc. No. 3.

[10] In this motion, Harris sought to amend his habeas petition and supporting memorandum of law to include *Brooks v. Gilmore*, Civ. A. No. 15-5659, 2017 WL 3453324 (E.D. Pa. Aug. 11. 2017) for "persuasive argument pertaining to prejudice arguments." Mot. to Amend Section 2254 at 1, Doc. No. 8. More specifically, he asserted that this case would "show that the alleged errors that was [sic] committed during trial coupled with the reasonable doubt charge given by [J]udge Hughes, should in no way be considered as harmless errors." *Id.*

[11] As with the prior motion, Harris wants the court to consider *Brooks v. Gilmore* as part of this proceeding. *See* Am. Pet. in Supp. of Section 2254 at 1, Doc. No. 13. He explains that he "seeks to use [*Brooks*] in support of his original claims, and to rebut any harmless argument that may be made by the Commonwealth." *Id.* He further explains that he

> would like the record to reflect that [he] is in no way attempting to argue this issue. [He] is well aware that [he] waived this issue for failing to argue it, or object to it during trial. [He] seeks to use this case in support of the claims argued in the original petition. The district judge[] stated "the

The respondents filed a response to the habeas petition on November 20, 2018. *See* Doc. No. 16. Harris then filed a "traverse" in further support of his habeas petition and in reply to the respondents' response, which the clerk of court docketed on June 10, 2019. *See* Doc. No. 20.

Judge Lloret issued a report and recommendation on May 19, 2020 (the "R&R"). *See* Doc. No. 23. With respect to Harris's claims, Judge Lloret first thoroughly addressed Harris' claim that his appellate counsel was ineffective for failing to argue that the trial court erred when allowing the prosecutor to read portions of Harris's testimony from a prior trial while also ruling that Harris had the option to take the stand to rebut the portions read by the prosecutor. *See* R. & R. at 1–2, 11–47. Judge Lloret determined that the state court's decision was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts. *See id.* at 2, 42–47.

Judge Lloret then addressed Harris's prosecutorial misconduct claim. *See id.* at 2, 47–52. Judge Lloret concluded that the state courts' decision to reject Harris's prosecutorial misconduct claim was not an unreasonable application of Supreme Court precedent. *See id.* at 2, 50–52.

---

reasonable doubt standard exists to protect the presumption of innocence, that bedrock axiomatic and elementary principle lies at the foundation of the administration of our criminal law." [H]e further stated, "the Supreme Court has held that the reasonable doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts at issue." A jury charge that defines this fundamental principle by means of an emotionally charged example weighted in favor of resolving doubt for the purpose of providing life-saving care to a loved one does not perform that function." [sic]

Petitioner ask [sic] that this Court consider while deciding petitioner [sic] case the impact the reasonable doubt charge, coupled with the prosecutor's misconduct and the trial court's error, along with the fact that the evidence wasn't overwhelming, and the prosecution's success depended upon the jury's acceptance from three alleged eyewitnesses, two of whom recanted to statements that never matched the crime scene, and one who [sic] testimony shows he didn't even witness the shooting, let alone see petitioner commit the crime, see petitioners [sic] contradicted evidence and non[-]harmless error argument at pages 19-21.

The district judge clearly states, "that the instruction as a whole violates due process rights, because the jury could interpret it to allow a conviction based on any "degree of proof below", the reasonable doubt standard.

*Id.* at 1–2.

In addition to these two claims, Judge Lloret interpreted Harris's amended habeas petition as including a claim "that the trial judge presiding over his third trial erred in instructing the jury regarding reasonable doubt." *Id.* at 3. Judge Lloret acknowledged that Harris indicated that he was not asserting a claim based on the reasonable doubt jury instruction, but nonetheless determined that the claim was barred because it was unexhausted and procedurally defaulted. *See id.* at 3, 50 n.35.

Harris filed objections to the R&R on July 27, 2020. *See* Doc. No. 25. The respondents did not file a response to the objections. The objections are ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

Upon timely and specific objection by a party to a portion of a report and recommendation issued by a magistrate judge, the district court "is obliged to engage in de novo review of only those issues raised on objection." *Morgan v. Astrue*, Civ. A. No. 08-2133, 2009 WL 3541001, at *2 (E.D. Pa. Oct. 30, 2009) (citing 28 U.S.C. § 636(b)(1) and *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989)); *see* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *Robinson v. Hicks*, 450 F. App'x 168, 172 (3d Cir. 2011) ("The District Court must conduct a de novo review of the portions of the R & R to which objections are made."). Despite this *de novo* review, the court may "rely upon the magistrate judge's proposed recommendation to the extent that [the court], in the exercise of sound discretion, deem[s] proper." *Wallace v. Keen*, Civ. A. No. 3:12-CV-1366, 2012 WL 5197948, at *1 (M.D. Pa. Oct. 19, 2012) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980) and *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984)). In conducting this review, the court may "accept, reject, or modify, in whole or in

part," the report's findings and recommendations. 28 U.S.C. § 636(b)(1). "The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

## B.   Analysis

Harris raises numerous objections to the R&R. The court will address each objection in turn, starting with Harris's objections to portions of the R&R dealing with his ineffective assistance of counsel claim and then turning to his objections to portions of the R&R addressing his prosecutorial misconduct claim.

### 1.   Objections to Portions of R&R Addressing Ineffective Assistance of Counsel Claim

#### a.   First Objection

As indicated above, Harris contends that his direct appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in refusing to allow Harris to read in a portion of his testimony from a prior trial after the prosecutor indicated that he was going to introduce portions of that testimony as rebuttal evidence. To establish that his direct appellate counsel was ineffective, Harris has to "first demonstrate[] that his counsel's performance fell below an objective standard of reasonableness." *Nguyen v. Att'y Gen. of N.J.*, 832 F.3d 455, 464 (3d Cir. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland* standard to claims of ineffective assistance of appellate counsel); *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) ("The two-prong standard of *Strickland* . . . applies to a defendant's claim that his appellate counsel was ineffective." (citations omitted)). "In making this determination, *Strickland* cautioned that courts should be 'highly deferential' when assessing counsel's performance and requires courts to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

11

assistance." *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020) (quoting *Strickland*, 466 U.S. at 689).

In addition to establishing that counsel's performance was objectively unreasonable, Harris "must show that he was prejudiced by counsel's deficient performance, meaning that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694); *see United States v. Mannino*, 212 F.3d 835, 845 (3d Cir. 2000) ("[T]he prejudice prong of a *Strickland* analysis is satisfied if there is a reasonable probability that the result of the *appeal* would have been different had counsel's stewardship not fallen below the required standard."). "A 'reasonable probability' means a probability 'sufficient to undermine confidence in the outcome.'" *Nguyen*, 832 F.3d at 464 (quoting *Strickland*, 466 U.S. at 694). Also, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one" of the two requirements. *Strickland*, 466 U.S. at 697. "Thus, unless there is a finding that counsel acted unreasonably, there is no need to consider whether there was prejudice that can be attributed to his representation." *Nguyen*, 832 F.3d at 464 (citing *Strickland*, 466 U.S. at 697). Conversely, the court may address the prejudice prong first, "'[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (quoting *Strickland*, 466 U.S. at 697).

In the R&R, Judge Lloret addressed Harris's ineffectiveness argument by providing a thorough background of Harris's state court proceedings, particularly those illustrating the history of this claim. In this background section, Judge Lloret addressed a dispute in the record as to exactly which portions of his prior testimony Harris sought to have introduced during his trial. *See* R. & R. at 31–33.

Judge Lloret pointed out that at his PCRA hearing, Harris informed the PCRA court about

which testimony he wanted the jury to hear:

> Mr. Harris:    The last time we had this hearing, Your Honor, for some reason my argument, I think I confused you, Your Honor, and you basically took my argument to say that it wasn't my bullet that killed him, it was my co-defendant's. I never made such argument. In fact, I testified at all my previous trials I was a block away when this shooting happened. I didn't get on the stand on the third trial because I got tired of answering questions about Joseph Matthew Pratt. Now, Your Honor, in this issue, Your Honor, by Judge Hughes not allowing me to read this prior testimony—can I read to you these two excerpts of the prior testimony I wanted to read in? I want you to listen to what it is, Your Honor.
>
> The Court:     Sure.
>
> Mr. Harris:    Okay, this is a question from the Commonwealth to me: "You said something I wanted to ask you about a second ago. You said they come to court and don't tell the truth, they come and lie, that makes you look guilty."
>
>                Answer: "No. I didn't say they come to court with a lie or they try to lie by saying I didn't sign the statement, that makes me look guilty because it seems like I am either intimidating them because they were around me."
>
>                Now, question: "But you would agree because you yourself said it, I never brought it up, that when witnesses come to court and go south, it makes you look guilty."
>
>                My answer was: "If these witnesses somehow makes [sic] a statement and their statement is exactly what the crime scene say it is and they made the statements at one time, now they saying I didn't make them statements, then, yeah, I would agree it would make a person look guilty."
>
>                This is what I wanted the jury to hear.

*Id.* at 31–32 (quoting N.T., Oct. 7, 2014, at 18–22).

After referencing this testimony, Judge Lloret then explained that, even though Harris was

claiming as part of his PCRA action that he wanted these portions of his testimony read into the

record, this "was not, in fact, what . . . Harris had argued during the third trial that he wanted to

place before the jury to complete the portion submitted by the Commonwealth on rebuttal." *Id.* at

32 n.24. Instead,

> [a]ll of the . . . submissions [prior to Harris's September 3, 2014 memorandum of
> law submitted to the PCRA court prior to the October 7, 2014 hearing] by both the
> Commonwealth and . . . Harris were in agreement that the passage . . . Harris wished
> to read in at the third trial was that found at page 104 of the December 18, 2003
> transcript[.]

*Id.* Judge Lloret then cited to numerous submissions which indicated that this single passage on

page 104 of the December 18, 2003 transcript was what Harris had argued he wanted read into the

record at trial. *See id.* He then pointed out that the Commonwealth had informed the PCRA court

that Harris's argument had changed regarding the portions of the prior testimony he had wanted

read into the record. *See id.* (citing Commonwealth's Mar. 18, 2015 Ltr. Br. at 10, n.7).

> After considering this background, Judge Lloret

> agree[d] that . . . Harris' claim, as originally presented to the state court, was limited
> to the single passage at page 104 of the December 18, 2003 transcript. *See supra*,
> at 13 (italicized testimony). To the extent that his habeas [claim] is based on the
> additional testimony cited to Judge Lerner at the PCRA hearing on October 7, 2014,
> the argument is barred because he did not raise it with the trial judge or on direct
> appeal. Nor can . . . Harris blame his appellate attorney for failing to raise the
> additional testimony from a prior trial during . . . Harris' direct appeal. . . . Harris
> conducted his third trial pro se and is responsible for the material actually presented
> to the trial judge, which did not include the added material belatedly mentioned
> during the PCRA hearing.

*Id.*

Harris objects to Judge Lloret's determination that his ineffective assistance claim is

limited to a single passage that he wanted read into the record at the time of his trial and not any

additional passages from his prior testimony.[12] *See* Objs. at 1. He appears to assert that he used the

---

[12] In the objections, Harris describes the R&R as stating: "'[P]etitioner waived any challenge to the additional
testimony from N.T. 12/18/03 pgs. 107-108', and that petitioner's argument should be based off the single passage at
n.t. [sic] 12/18/04 [sic].' [sic]" Obj. to R. & R. ( "Objs.") at 1, Doc. No. 25 (citing R. & R. at 32–33). While Harris's

single passage mentioned at trial "as an example of how the prosecutor was trying to distort the record," and he did not intend to limit his argument to that passage. *Id.* He also states that the trial judge "never gave [him] the opportunity to explain his argument or ask [him] what he would like read in to correct the misleading impression," and the judge "interrupted [his] argument and only gave [him] the choice to take the stand, or object[.]" *Id.*

He further argues that he and the Commonwealth never "agreed" on anything relating to the prior testimony. *Id.* He claims that he "requested at trial to read it all." *Id.* He further contends that he "challenged the additional evidence at the first available opportunity, which was at the PCRA level, before that court rendered a decision." *Id.*

Harris's objection is meritless. As for his claim that Judge Lloret erred in saying that he and the Commonwealth were "in . . . agreement" on the portion of the testimony Harris wanted read into the record, Harris misconstrues the R&R. Judge Lloret never states that there was an actual agreement; instead, he merely explained that neither side included any reference to Harris wanting to read additional portions of his prior testimony into the record until just prior to his PCRA hearing. Judge Lloret accurately referenced multiple submissions that did not discuss any testimony that Harris wanted read into the record, other than the single passage at page 104 of the December 18, 2003 transcript. As such, Harris has not shown that the court should disturb this portion of the R&R.

Judge Lloret also appropriately determined that the first time Harris indicated that he wanted additional portions of his prior testimony read into the record was at the time of his PCRA proceedings and not during the trial. In this regard, Judge Lloret accurately cited to the on-the-

---

recitation seemingly encompasses Judge Lloret's conclusions, the court was unable to locate these quotations in the R&R.

record argument he had with the trial judge relating to the prosecutor's request to read portions of

his prior testimony into the record:

| | |
|---|---|
| Mr. Harris: | The only thing I have a problem with, I understand what he is saying as far as the read back. He wants to read back. I have no problem with certain portions, but there is one portion, Your Honor, where he is reading one part, skipping over another part, and reading one part. So it makes it sound like, say, for instance, right here, Your Honor, page 104, Your Honor. |
| The Court: | Page 104. |
| Mr. Harris: | Number 18, Your Honor. |
| The Court: | Thank you. And what line would you be referring to? |
| Mr. Harris: | He wants to start at 13. So he wants to go and say, "So I went back to the block. I asked Jonathan. I said Who is Marvin Wilson? He said Jonathan said he is sitting right here. So he came back before me. I guess I told him the story already so he looked a little scared like I was going to do something to him." |
| | And he wanted to stop right there. Because it says, first of all, I'm not stupid. I'm not going to do something to somebody that is going to be a witness. That is like taking one problem and making another problem. |
| The Court: | The problem you have, Mr. Harris, is that [the] Commonwealth is entitled to put your statements into the record, even statements you made under oath. |
| | The Commonwealth cannot be compelled to put your exculpatory statements into the record. They cannot. So he is entitled to read those portions of the testimony that you gave under oath. Period. He is not entitled to read everything that you said because you said a bunch of stuff to benefit yourself and he is not compelled to read that. Period. |
| Mr. Harris: | Okay. As he is reading that part, I can't tell the jury -- |
| The Court: | Are you going to take the stand? You are going to get up and sa[y] you changed -- you already rested. |
| Mr. Harris: | Yeah, but that's okay. |

| | |
|---|---|
| The Court: | Are you going to take the stand? |
| Mr. Harris: | That is what I'm saying. In my closing, he admits his evidence. |
| The Court: | He is putting in the evidence. He didn't put the whole transcript in, number 18, so you don't get to argue it during closing. |
| Mr. Harris: | He gets to put this portion in, Your Honor. |
| The Court: | He gets to put the portion in. |
| Mr. Harris: | Shouldn't I be able to say, you are going to read your portion, I'm going to read it all to them. |
| The Court: | You don't get to tell him that. And you don't get to tell the jury that. |
| Mr. Harris: | He's making out a point. He's trying to make it seem like -- |
| The Court: | Mr. Harris, strategic decisions -- it is on the record, Mr. Harris. But what you need to be clear about is what the law is, and I have tried to tell you. |
| Mr. Harris: | And it's wrong. |
| The Court: | Okay. So object. |
| Mr. Harris: | I definitely object. |
| The Court: | Done. Move on. |

R. & R. at 13–15 (citing N.T., Jan. 26, 2007, at 20–23).

As evidenced by this exchange with the trial judge, Harris was concerned with the prosecutor skipping one portion of his prior testimony, in which he essentially testified that he would not be stupid enough to attempt to intimidate a witness because that would only potentially create another problem for him. *See* N.T., Jan. 26, 2007, at 21:11-14. Harris's entire argument was based on the omission of this passage. He never informed the trial court that he sought to introduce any other portion of his prior testimony, much less the prior testimony he identified during the October 2014 PCRA hearing.

17

The court recognizes that, near the end of Harris's conversation with the trial judge, Harris asks, "Shouldn't I be able to say, you are going to read your portion, I'm going to read it **all** to them?" *Id.* at 22:23-25 (emphasis added). Despite Harris's reference to the word "all" here, there is no indication that he was arguing to the trial court that he wanted to read his **entire** prior testimony into the record. Instead, the totality of his argument with the trial court shows that "all" referred to the single passage of his prior testimony that the prosecutor omitted.[13] As such, Judge Lloret properly determined that Harris only raised an issue with the single passage referenced above when arguing before the trial court. Thus, even if appellate counsel had raised a claim on direct appeal relating to the non-introduction of other portions of Harris's prior trial testimony, he would have been limited to this single passage due to Harris failing to preserve any objection regarding other passages of his prior testimony. Accordingly, Judge Lloret properly concluded that Harris is barred from raising any claim relating to prior testimony beyond the single passage mentioned above.[14]

b.      Second Objection

For his second objection, Harris objects to Judge Lloret's finding that

> [t]he three sentences excised from [Harris's] testimony did not create a misleading impression that required the passage's admission under the Due Process [C]lause, whatever the proper result was under state evidentiary rules. The passage read by

---

[13] As an aside, any argument by Harris in this regard would not have complied with Rule 106 of the Pennsylvania Rules of Evidence, the precise Rule he claims the trial court violated. In this regard, Rule 106 states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Pa. R.E. 106. This Rule "give[s] the adverse party an opportunity to correct a misleading impression." *Commonwealth v. Passmore*, 857 A.2d 697, 712 (Pa. Super. 2004) (citation omitted). It surely does not appear that the prosecutor's reading of this portion of Harris's prior testimony would have required, "in fairness" to Harris, the reading of the entirety of Harris's prior trial testimony. Moreover, it is surely unclear that reading the entirety of Harris's prior testimony into the record would have corrected any purported misleading impression.

[14] In addition, while Harris contends that the trial judge cut him off, there is no indication that the trial court precluded Harris from identifying the portions of the prior testimony he wanted to introduce. Instead, Harris informed the court exactly which passage he wanted introduced, which is not the same passages he referenced during the PCRA proceedings. Thus, the fault for failing to preserve any objection relating to additional prior testimony lies with Harris, as he represented himself during the trial.

the prosecutor did not suggest in any way that Mr. Harris attempted to intimidate Mr. Wilson.

Objs. at 2 (citing R. & R. at 43 n.31).[15] Judge Lloret included this finding as part of his determination that the state court did not violate the Due Process Clause by excluding Harris's desired prior testimony.[16] *See* R. & R. at 43 n.31.

In addressing the due process issue, Judge Lloret first pointed out that, to the extent that Harris argued that there was a violation of Pennsylvania Rule of Evidence 106, his argument was not cognizable on federal habeas review. *See id.* (explaining that "[f]ederal courts do not sit to correct error of state evidentiary law" (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). He also noted that Harris "did not make or preserve an argument that the Due Process [C]lause mandated introduction of his snippet of prior testimony." *Id.* Even if he did, Judge Lloret explained that "[t]he exclusion of evidence based on state evidentiary rules rarely amounts to a [d]ue [p]rocess violation, and it certainly did not in this case." *Id.* (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 (1983)).

Judge Lloret determined that there was no due process violation because the prosecutor merely read into the record Harris's own description of the circumstances of his meeting with a witness, Marvin Wilson.[17] *See id.* More specifically, the recited testimony "was . . . Harris'

---

[15] As with Harris's first objection, he has misquoted Judge Lloret in this objection. *See* Objs. at 2 ("The Magistrate Judge also states 'the three sentences excised from the defendant's testimony did not create a misleading impression, and that the passage read by the prosecutor did not suggest in any way that Mr. Harris attempted to intimidate Mr. Wilson." (citation omitted)). He omits the middle portion of Judge Lloret's statement where he discusses the Due Process Clause. *See* R. & R. at 43 n.31.

[16] Judge Lloret noted that the Superior Court never definitively concluded that the trial court erred in excluding the reading of this testimony; instead, the PCRA court did. *See* R. & R. at 43 n.31.

[17] The specific prior testimony read by the prosecutor was:

> "So I went back to the block. I asked John-John, I said, 'Who is Marvin Wilson that stayed at 39th and Reno Street?' John-John said, 'He is sitting right here.' So he came back before me. I guess he told him the story already. So he looked real scared like I was going to do something to him."

N.T., Jan. 26, 2007, at 36:13–20; *see also* R. & R. at 13 (referencing testimony).

impression of Mr. Wilson's demeanor at the time Harris confronted Wilson about Wilson's statement to police naming Harris as a killer." *Id.* Judge Lloret indicated that the portion that Harris wanted read, about him not being stupid enough to try to intimidate Mr. Wilson, would not alter or explain Harris's own impression of Mr. Wilson at the time he met with Harris. *See id.* Thus, he concluded that "[t]he excised portion of . . . Harris' statement is not a clarification of anything that the prosecutor read to the jury" and "exclusion of th[is] evidence certainly did not amount to a [c]onstitutional violation." *Id.*

Harris contends that Judge Lloret erred here because he "downplay[ed] the seriousness of the prosecutor's misuse of the prior testimony." Objs. at 2. He asserts that the prosecutor "was allowed to bolster the statements the witnesses disavowed, and argue witness intimidation as the reason the witness didn't testify according to the statement." *Id.*

This objection also lacks merit. In the first instance, Judge Lloret correctly found that Harris never argued in the state courts that the trial court violated the Due Process Clause by not permitting him to introduce a portion of his prior testimony. Thus, "any attempt to present the claim as a due process violation in this court would result in a finding that the claim is unexhausted and procedurally defaulted." *Yancey v. Lockett*, Civ. A. No. 2007-CV-1963, 2008 WL 423485, at *7 (E.D. Pa. Feb. 14, 2008) (citations omitted).[18]

---

[18] Regarding procedural default, a habeas petitioner must present all claims to the state courts before a district court may entertain them. *See* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--(A) the applicant has exhausted the remedies available in the courts of the State . . . ."). "[T]he exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.*

　　Harris could excuse a procedural default if he can show cause for the procedural default and actual prejudice arising therefrom, or that a fundamental miscarriage of justice will result if the claim is not considered. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Harris could demonstrate cause for procedural default if he can show that some objective factor external to the defense impeded or prevented his ability to comply with the state procedural rules. *Caswell v. Ryan*, 953 F.2d 853, 862 (3d Cir. 1992). The cause must be "something that cannot fairly be attributed to [Harris]." *Coleman*, 501 U.S. at 753. To show prejudice, Harris must present evidence that this factor did more than

Even if Harris had properly preserved and asserted a due process claim, the court recognizes that because the "Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *Rosario-Torres v. Lane*, Civ. No. 3:16-cv-1891, 2019 WL 5692537, at *8 (M.D. Pa. Nov. 1, 2019) (quoting *Marshall*, 459 U.S. at 438 n.6), such rulings are generally entitled to deference by the federal habeas court. *Id.* (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). However, a federal habeas court may review a state evidentiary ruling if a due process violation is alleged. *See Yancey*, 2008 WL 423485, at *7 ("[A] state evidentiary ruling can provide a basis for habeas relief if the ruling violated due process."). The challenged evidentiary ruling must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" to violate due process. *Wright v. Rivard*, 856 F. App'x 16, 22 (6th Cir. 2021) (quoting *Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017)).

Judge Lloret correctly concluded that the state court's evidentiary ruling did not amount to a due process violation. Rather than "downplaying" the seriousness of the prosecutor's use of Harris's prior testimony, as Harris alleges, Judge Lloret properly characterized the testimony as Harris's impression of Mr. Wilson's demeanor when they met in prison. Moreover, as Judge Lloret explained, Harris was able to cross-examine witnesses during trial to get across to the jury his belief that the police had fabricated the statements of Mr. Wilson and other witnesses. *See* R. & R.

---

merely create a possibility of prejudice; it must have "worked to [Harris's] <u>actual</u> and substantial disadvantage." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). The "fundamental miscarriage of justice" exception to procedural default is concerned only with "actual" innocence and petitioner must show that in light of new evidence it is more likely than not that no reasonable juror would have convicted him absent the claimed error. *Schlup v. Delo*, 513 U.S. 298, 327−28 (1995); *see also Hubbard v. Pinchak*, 378 F.3d 333, 338 (3d Cir. 2004) (finding that credible allegation of actual innocence constitutes miscarriage of justice that enables federal court to hear merits of otherwise procedurally defaulted habeas claims), *cert. denied*, 543 U.S. 1070 (2005).

       Harris has not even attempted to show cause, prejudice, or a miscarriage of justice here. As such, any procedural default is not excused.

at 43 n.31. Furthermore, Harris surely argued to the jury as part of his closing that he never asked

a witness to lie for him and he never intimidated any witnesses. *See, e.g.*, N.T., Jan. 26, 2007, at

pp. 67:22-25–68:2-7. Accordingly, Harris has not shown that Judge Lloret erred in concluding that

any possible violation of Pennsylvania Rule of Evidence 106 by the trial court undermined the

fundamental fairness of his entire trial, and the court overrules this objection as well.

c.    Third Objection

For his third objection, Harris claims that Judge Lloret erred in noting that the Superior

Court never concluded that the trial court violated Pennsylvania Rule of Evidence 106; instead,

the PCRA court reached this conclusion. *See* Objs. at 2 (citing R. & R. at 43). Harris points out

that the PCRA court and the Commonwealth had agreed that the trial court violated Rule 106, and

the Superior Court "never disturbed the P[C]RA court's finding concerning the trial court's error."

*Id.*

This objection is without merit. It is unclear precisely what Harris is objecting to here. He

has not pointed out anything inaccurate in the R&R as the Superior Court never found a Rule 106

violation, just as Judge Lloret indicated. In addition, it is immaterial for purposes of this habeas

review whether the Commonwealth agreed that there was a Rule 106 violation or not.[19] Therefore,

this third objection is overruled.

d.    Fourth Objection

Harris's fourth objection reflects his opposition to Judge Lloret's determination that

"[t]here was significant evidence presented at trial that suggested . . . Harris did, in fact, make

---

[19] The court notes that the respondent here does not concede that the trial court violated Rule 106. *See* Resp. to Pet. for Writ of Habeas Corpus ("Resp.") at 17, Doc. No. 16 ("But here, there was no misleading impression to correct. The portion of petitioner's prior testimony that the Commonwealth introduced did not suggest that petitioner had done anything to intimidate Mr. Wilson. To the contrary, the passage made clear that, despite any initial fright, Mr. Wilson had a genial conversation with petitioner (N.T. 1/26/07, 36).").

attempts to influence the testimony of the three eyewitnesses who gave statements to police naming him as one of the shooters of Mr. Bryant." R. & R. at 43 n.31; Objs. at 2.[20] Harris contends that there was no evidence presented that he tried to influence any witness's testimony. He asserts that he would have preferred that the witnesses testify in accordance with their prior statements as he believes those statements were inconsistent with the evidence found at the crime scene. *See* Objs. at 2.

This objection is meritless. As Judge Lloret pointed out, there was significant evidence which "suggested" Harris attempted to influence the testimony of the three eyewitnesses. The fact that all three witnesses recanted their prior testimony, combined with the fact that Harris had testified at his earlier trial that he met with one of the witnesses, Mr. Wilson, in between the time Mr. Wilson gave his statement to police and his trial testimony, would support a suggestion that Harris attempted to influence the testimony of at least Mr. Wilson. Also, Harris had testified that he asked Mr. Wilson why he made the statement to the police,[21] *see* N.T., Jan. 26, 2007, at 36:22-25, so it is not as if Harris did not have contact with any witness prior to their testimony at his third trial. Therefore, the court overrules this objection.

e.     Fifth Objection

For his fifth objection, Harris raises an issue with Judge Lloret's statement that the Superior Court, in affirming the denial of Harris's PCRA petition, "sidestepped the errors in the PCRA court's ruling." Objs. at 2 (citing R. & R. at 37). He notes that "[t]he Superior Court's ruling is derived from the PCRA court's ruling, both rulings states [sic] the same substance, and both rulings

---

[20] While this objection falls under Harris's third numbered objection, *see* Objs. at 2, it raises an objection to a different portion of the R&R, so the court has separately addressed it.

[21] Harris's prior testimony does not include testimony that he directly tried to intimidate Mr. Wilson (as would be expected from Harris's own testimony); instead, his testimony seemed to portray a pleasant conversation over Mr. Wilson's testimony that implicated Harris as the shooter. *See* N.T., Jan. 26, 2007, at 37:2-13.

say that appellant [sic] counsel added the claim within the recusal argument[.]" *Id.* He further indicates that the only difference between the two decisions is that the PCRA court mentioned Pennsylvania Rule of Evidence 106 and the Superior Court's decision did not. *See id.* at 3.

It appears that the court must reluctantly sustain this objection, although it does not in any way affect the ultimate recommendation that the court deny the habeas petition. Unfortunately, after thoroughly reviewing the R&R, the court cannot determine which errors Judge Lloret believes that the Superior Court "sidestepped." The R&R does not mention any specific errors by the PCRA court. As such, the court will sustain the objection and strike from the R&R the reference to the Superior Court sidestepping errors in the PCRA court's ruling.[22]

f.      Sixth Through Tenth Objections[23]

In his sixth objection, Harris appears to contest Judge Lloret's statement that "[t]he Superior Court did not, and need not, have listed all of the adverse evidentiary rulings that were included in the recusal argument." Objs. at 3 (citing R. & R. at 45). Judge Lloret had included this statement when addressing Harris's argument that the Superior Court unreasonably found that "direct appeal counsel included the trial court's adverse evidentiary rulings within the recusal issue that he raised on direct appeal." R. & R. at 44 (citing *Harris III* at *8). Judge Lloret concluded that the Superior Court's finding was not unreasonable.

He noted that Harris contended that the Superior Court's finding was unreasonable because his direct appellate counsel never specifically mentioned the Rule 106 issue as part of his argument

---

[22] The R&R does note that, unlike the PCRA court's decision, the Superior Court quoted directly from direct appellate counsel's testimony during the supplemental PCRA hearing on July 22, 2014. *See* R. & R. at 37. It is unclear how this would have qualified as an "error."

[23] The court's analysis to resolve Harris's sixth objection, covers areas addressed by Harris's seventh through tenth objections. Thus, while the court first addresses the sixth objection in this section, the court will address Harris's seventh through tenth objections once the court gets to the portion of the analysis relevant to those other objections.

that the trial court erred in not recusing.[24] *See id.* at 44–45. Judge Lloret rejected Harris's contention, explaining that the "Superior Court was acquainted with the facts," and it had referenced direct appellate counsel's testimony relating to the issue about the introduction of Harris's testimony from the prior trial. *See id.* at 45. He further explained that the Superior Court did not have to list all the adverse evidentiary rulings that direct appellate counsel included in his recusal argument. *See id.* He also determined that the Superior Court's "point" was that direct appellate counsel had a reasonable strategy in deciding which issue was most likely to prevail on appeal, and this determination was entitled to deference under the AEDPA. *See id.*

As indicated above, Harris contends that Judge Lloret erred by determining that the Superior Court did not unreasonably find that direct appellate counsel raised adverse evidentiary rulings as part of the recusal issue. He asserts that Judge Lloret and the respondent "are trying to make it seem like the[ Superior Court wasn't] talking about the Rule 106 issue." Objs. at 3. Since direct appellate counsel never included the Rule 106 issue in the appellate brief, Harris argues that the Superior Court's statement was an unreasonable factual finding.

Regarding unreasonable factual findings, the court notes that

under 28 U.S.C. § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings. *See Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Determinations of factual issues made by state courts are presumed to be correct.[25] 28 U.S.C. § 2254(e)(1); *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029. However, "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029.

---

[24] Harris's appellate brief did not contain a reference to Rule 106. *See generally* Resp., Ex. C, Br. of Appellant, *Commonwealth v. Harris*, No. 2693 EDA 2015 (Pa. Super.) ("Appellate Br.").

[25] "This presumption of correctness applies to factual determinations of both state trial and appellate courts." *Lewis v. Horn*, 581 F.3d 92, 111 (3d Cir. 2009).

*Dennis v. Sec., Pa. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016) (footnote added).

Considering the standard for determining whether a state court decision is based on an unreasonable determination of the facts, and recognizing the deference afforded to state court decisions, the court does not find that the Judge Lloret erred in concluding that the Superior Court did not reach an unreasonable factual determination. The Superior Court stated that direct appeal counsel determined that the strongest issue on appeal was the recusal issue, "[a]s such, direct appeal counsel included the trial court's adverse evidentiary rulings within the recusal issue that he raised on direct appeal." *Harris III* at *8. The Superior Court's statement reflects direct appellate counsel's testimony that he included references to the trial judge's adverse evidentiary rulings as a point in support of the recusal claim. *See id.* at *7−8 (quoting N.T., July 22, 2014, at 36−39). Although direct appellate counsel did not include the Rule 106 issue as part of his adverse evidentiary rulings when arguing the recusal issue, he did argue that the trial judge's partiality was illustrated by the improper admission of evidence relating to Harris's incarceration and the denial of all of Harris's pretrial motions without a hearing. *See* Appellate Br. at 10−12.[26] Thus, the

---

[26] Overall, direct appellate counsel appears to have included the following grounds in support of his claim that the trial judge erred in not recusing: (1) the Superior Court determined that the trial judge erred during Harris's second trial and had ordered a new trial based on this error; (2) the trial court claimed that Harris never filed a motion for recusal despite entering an order denying a motion to recuse; (3) the trial court appeared to assert that Harris misrepresented the record when claiming that he filed a motion to recuse; (4) the trial court refused to allow Harris's court-appointed back-up counsel to sit at counsel table; instead, the court instructed counsel to sit in the back row and be available when he could; (5) in the sentencing hearing after Harris's former trial, the trial court held Harris in contempt three times and sentenced him to the maximum sentence permitted by law; (6) the trial court never held a hearing on the motion to recuse; (7) despite Harris facing reduced charges for his third trial, the trial court increased bail from $1.5 million to $2.5 million, and did not provide a reason for the increased bail; (8) despite a pretrial ruling that prevented the Commonwealth from referring to the fact that Harris was incarcerated, the trial court permitted the Commonwealth to reference his incarcerations on several occasions during the trial; (9) although Harris had requested trial transcripts in this matter to assist with his appeal, it took a petition and Superior Court order to have the notes of testimony transcribed; (10) when the notes of testimony were finally transcribed, which was more than a year after the Superior Court ordered the production of the transcripts, the trial court had already issued its Pennsylvania Rule of Appellate Procedure 1925(a) opinion; (11) the trial court complained that Harris failed to provide specific references to the transcript in his Pennsylvania Rule of Appellate Procedure 1925(b) statement of matters complained of, yet the transcripts were not provided to allow Harris to be more specific; (12) the trial court permitted the prosecutor, over Harris's objection, to compare him and the streets of Philadelphia to individuals being killed in the war in Iraq; (13) the trial court refused to instruct the jury on a mere presence charge despite evidence that would have supported the

Superior Court did not render an unreasonable factual determination when it pointed out that direct appellate counsel included adverse evidentiary rulings, even if not the Rule 106 issue, in arguing that the trial court erred in not granting the motion to recuse.

Even if the court were to find that Judge Lloret's determination was incorrect and that the Superior Court's statement was factually inaccurate, Harris would not be entitled to habeas relief for two reasons: First, this factual inaccuracy was not the basis for the Superior Court's decision. Second, even if the Superior Court had based part of its ineffective assistance of counsel decision on this factual inaccuracy, it does not require relief because Harris has not demonstrated that he was prejudiced and the Superior Court's determination that he failed to show prejudice was not an unreasonable application of federal law.

Regarding the first reason, as Judge Lloret pointed out in the R&R, the overall point that the Superior Court made was that direct appellate counsel demonstrated a reasonable strategy by focusing his appellate brief on the primary issue that counsel determined was most likely to be successful: the recusal issue. *See* R. & R. at 44. This point related to the first requirement of an ineffective assistance of counsel claim, namely, whether counsel's performance was objectively unreasonable.

Contrary to Harris's assertion, direct appellate counsel was not required to raise every conceivable claim on appeal. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) (rejecting notion that "judges [should] second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client" because it "would disserve the very goal of vigorous and effective advocacy [and] . . . [n]othing in the Constitution or [the Supreme Court's] interpretation of that document requires such a standard" (footnote omitted)).

---

charge; (14) the trial court expressed her personal opinions of Harris; and (15) the trial court denied all of Harris's pretrial motions without a hearing. *See* Appellate Br. at 6–12.

Instead, "counsel need not, and should not, raise every non-frivolous claim but rather may select among them in order to maximize the likelihood of success on appeal." *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011) (citation omitted). "Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, 137 S.Ct. 2058, 2067 (2017) (citation omitted). Direct appellate counsel testified that he exercised discretion as Harris's attorney in raising the bail issue over the issue regarding Harris's prior testimony "because [Harris] was more concerned with [the bail issue] at the time." N.T., July 24, 2014, at 36. He also exercised his discretion and professional judgment in choosing to focus more on the recusal issue. As Judge Lloret determined, the Superior Court's "point, that [direct appellate counsel] demonstrated a reasonable strategy, which he executed in the brief that was filed, sets out a reasonable state court ruling, which is entitled to deference under the AEDPA."[27] R. & R. at 45. This court agrees with Judge Lloret's determination.

The second reason why Harris would not be entitled to habeas relief is even if the Superior Court's statement regarding "adverse evidentiary rulings" was an unreasonable determination of fact, this determination would not have affected the second requirement to establish an ineffective assistance of counsel claim, *i.e.* prejudice. As indicated above, to prevail on his ineffective assistance of counsel claim, Harris would have to show that the outcome of the appeal would have been different.

---

[27] Harris also appears to argue that "the Superior Court's ruling that appellate counsel's [sic] can argue one issue within another issue, should fall below the Strickland [sic] standards, because if the one issue isn't successful then the claim within the issue would never get reviewed independent." Objs. at 3. The court cannot tell if this is a separate objection because it does not specifically identify a portion of the R&R to which Harris is objecting. Nevertheless, Harris's argument does not make sense. If a subissue (such as adverse evidentiary rulings) is included within a larger issue (such as recusal), just because the larger is not ultimately meritorious would not mean that the subissue is not analyzed by the court. Instead, the opposite would occur, such as in the instance case: the court would review whether the trial court's adverse evidentiary rulings showed partiality or bias that would impact whether the trial court should recuse. Thus, while the adverse evidentiary rulings in this scenario would not provide a separate basis for relief (unless raised separately), they would be considered as part of the recusal issue.

The Superior Court concluded that Harris had failed to demonstrate prejudice insofar as he had "entirely fail[ed] to demonstrate how [direct appellate] counsel's strategy so undermined the truth-determining process so that no reliable adjudication of his guilt or innocence could have taken place." *Harris III* at *8. Judge Lloret determined that the Superior Court's prejudice finding was entitled to deference under the AEDPA. *See* R. & R. at 45 ("This finding was also a reasonable one entitled to deference under the AEDPA.").

Judge Lloret explained that "[e]ven if [he] were reviewing this issue *de novo*, [he] would find that . . . Harris has not established a viable [c]onstitutional claim to warrant relief here." *Id.* Judge Lloret went through the evidence introduced at trial and addressed the prejudice issue as follows:

> A review of the trial transcript verifies that the physical evidence does confirm that Mr. Bryant was shot at by two individuals, one on the sidewalk, and a second individual standing on the hood of the car, firing through the windshield.[28] Mr. Bryant's companion in the vehicle fired through the roof of the car, a perfectly logical action given that Mr. Harris had climbed onto the vehicle and was firing into it with a large caliber weapon. N.T. Jan. 22, 2007, pp. 213-216. Three witnesses gave statements at some point in time stating that Mr. Harris was the individual who climbed on the car.[29] The circumstances of all three witnesses' recantations, at various times, strongly suggests that those witnesses feared retaliation for their statements to police that Mr. Harris was the shooter. Also relevant, and certainly a circumstance that the jury likely considered, was the fact that both Mr. Cherry, the shooter on the sidewalk, and Joseph Pratt, Mr. Bryant's companion in the vehicle, were dead before police could question them. Additionally, the trial transcript demonstrates that Mr. Harris put before the jury the very evidence he suggests he was denied by Judge Hughes' ruling. During his cross-examination of Mr. Wilson, he asked Marvin Wilson:
>
> Q.     Did I ever threaten you?

---

[28] *See*[,] *e.g.*, N.T. Jan. 22, 2007, pp. 197-223 (Leo Rahill); Jan. 23, 2007, pp. 5-59 (Off. Carl Rone); Jan. 24, 2007, pp. 6-29 (Dr. Gregory McDonald, M.E.).

[29] I suggest that the jury also could have reasonably found that a fourth witness, Cherese Ball, who was called as a witness by Mr. Harris, also put Mr. Harris on the hood of the car, although like Antwain Ball and Marvin Wilson, not during her trial testimony. The Commonwealth established through the testimony of Detective Jerald Lynch that Ms. Ball also identified Mr. Harris, the "well dressed" man, as the shooter on the car's hood. N.T. Jan. 25, 2007, pp. 182-85.

> A.      No. I never was threatened. I never even seen you before in
> my life.

N.T., Jan. 24, 2007, p. 113. He argued the point during his closing:

> Now, ladies and gentlemen, Marvin was on my block. I didn't put
> him there. He is Commonwealth (sic) witness. How did he end up
> where I was at? He made this statement. We already showed you
> statement doesn't match up with the crime scene. He is on my block.
>
> Now, could you imagine if I was a fool and I was guilty of this crime
> and I did something to—excuse me—and something happened to
> that kid? Then it would make me look so guilty because he is on my
> block. But I didn't put him there.[30]

N.T., Jan. 26, 2007, p. 139.

> In light of all of the evidence, and of Mr. Harris' argument during closing,
> the addition of Mr. Harris' three-sentence attempt to suggest that he did not
> intimidate Mr. Wilson would have had no bearing on the outcome of this trial.
> Likewise, had Mr. O'Keefe argued on direct appeal that Mr. Harris should receive
> a new trial because Judge Hughes kept those three sentences from the third trial's
> jury, the result of the direct appeal would have (and should have) been no different.
>
> Because there was no prejudice to Mr. Harris, his appellate counsel did not
> provide ineffective assistance of counsel pursuant to Strickland when he failed to
> raise the evidentiary exclusion issue on direct appeal.

R. & R. at 46−47 (footnotes in original).

Harris objects to four aspects of this portion of Judge Lloret's analysis. First, he has an

overall objection to the prejudice determination. *See* Objs. at 3−5. He believes that Judge Lloret

"is clearly adopting the Commonwealth's theory of the case and disregarding the facts and the

physical evidence." *Id.* at 4. He asserts that there was no physical evidence to support the jury's

determination (or the witnesses' statements) that he was on top of the car firing a weapon. *See id.*

---

[30]  This passage, ("now, could you imagine . . . I didn't put him there.") is placed in quotation marks in the transcript.
It is not, however, a quotation from the prior testimony. It is Mr. Harris' argument, and a proper one, based on the
evidence that came in during the trial. The prosecutor, also possibly confused, initially objected to the statement, but
immediately withdrew the objection.

Instead, he contends that the evidence shows that the shooters were on the sides of the car.[31] *See id.* at 4−5. He also states that the forensic evidence shows that the passenger, while attempting to shoot at the shooter on the driver's side of the car, shot the decedent three times in his right side. *See id.* at 5. Harris also argues that the passenger was the individual who shot through the roof of the car numerous times. *See id.*

Despite Harris's arguments to the contrary, there was significant evidence to support the jury's verdict in the case. Although Harris claims that Judge Lloret just "adopted the Commonwealth's theory of the case" and did not "cite any testimony to rebut the alleged overwhelming arguments in [Harris's] memorandum or traverse," Judge Lloret in no way erred in pointing to some of the facts at trial which supported Harris's conviction, as **part** of his determination that Harris failed to sufficiently demonstrate prejudice. *See Saranchak v. Sec., Pa. Dep't of Corrs.*, 802 F.3d 579, 599 (3d Cir. 2015) (explaining that "*Strickland* prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes"). There is no indication that Judge Lloret did not review the evidence in the record and it surely is not an error to review that evidence and determine that it supports the jury's verdict in the case. And, as Judge Lloret explained, there is sufficient evidence supporting the jury finding that Harris was on the roof of the car and shot the decedent despite Harris's protestations to the contrary, such as, *inter alia*: (1)

---

[31] In this regard, Harris contends that

> [t]he testimony . . . pertaining to the directions of the wounds, and bullet holes suggest that there was no one on the roof of the car shooting. The statements don't match the physical evidence, [Harris] would have to be a superhero to walk up to a car, shoot six . . . bullets in the driver side of the car and then get on the roof of the car all while the passenger is firing twenty . . . shots off, and three . . . from the driver. The evidence shows that there was two shooters one shot through the passenger side of the car and the other shot through the driver side of the car, there was six . . . entrance holes on the driver's side, and one . . . on the passenger side of the car.

*Id.* at 5 (citation omitted).

the witness statements identifying Harris as the shooter, including the fact that two of the witnesses recanted their testimony suspiciously (such as Mr. Wilson having previously testified that he lied to the police and then denied saying anything to the police during the third trial, and Mr. Ball claiming that the transcript of the prior trial did not properly record his testimony), *see* N.T., Jan. 24, 2007, at 84−85, 103; N.T., Jan. 23, 2007, at 146); (2) the ballistician, Carl Rone, despite being unable to determine whether the bullet holes in the roof came from shots fired from inside or outside of the car, testifying that the bullet holes could not have come from shots fired from the passenger seat, which was the only place inside the car where someone shot a gun, *see* N.T., Jan. 23, 2007, at 53, 102; and (3) the medical examiner testifying that the decedent's wounds were consistent with someone standing on top of the car and shooting down at the decedent, *see* N.T., Jan. 24, 2007, at 24−25.

More significant than the ample evidence that supported Harris's convictions is the fact that even if direct appellate counsel had included the claim relating to the Rule 106 issue in the appellate brief, the result of Harris's appeal would not have been different. It is surely unclear that out of "fairness," the trial court needed to read in Harris's statement where he states that he would not have done anything to a witness against him, because the government's reading of Harris's prior testimony was limited to Harris's perception that Mr. Wilson looked scared when Harris met with him in prison. *See* N.T., Jan. 26, 2007, at 36. There was nothing in the statement read by the Commonwealth that Harris had done anything to Mr. Wilson or that he was going to do anything to Mr. Wilson.[32] *See id.* Also, the remainder of the portion of the testimony that the Commonwealth read into the record showed that Harris and Mr. Wilson had a non-confrontational conversation

---

[32] It would make sense that, regardless of what Harris was or was not going to do, that anyone who was a witness to a crime, much less a witness accusing someone else of murder, would look scared when near the accused, especially in the confines of prison.

about Mr. Wilson making a statement implicating Harris as shooting from the roof of the car, where Mr. Wilson told Harris that he never accused him of being a shooter. *See id.* at 36−37. At bottom, there was also nothing about what Harris wanted read into the record, which was his own self-serving testimony that he would never intimidate a witness against him, that would have rebutted Harris's perception of Mr. Wilson's feeling upon seeing Harris in the prison.

Nonetheless, even if the Superior Court had determined that the trial court erred in not allowing Harris to read in the additional testimony he wanted read into the record, any such error would have been harmless. As already indicated, the testimony Harris wanted read into the record was his own self-serving testimony that he would never do something to a witness. Also, as Judge Lloret pointed out in the R&R, Harris was able to cross-examine Mr. Wilson during the trial, and Mr. Wilson acknowledged that Harris not only had never threatened him, but they had never met before. *See* R. & R. at 46 (citing N.T., Jan. 24, 2007, at 113). Moreover, Judge Lloret accurately pointed out that Harris was able to argue to the jury that he never intimidated Mr. Wilson and recognized that doing so would only cause him to look guilty. *See id.* at 46−47 (citing N.T., Jan. 26, 2007, at 139). Accordingly, even if the Superior Court would have concluded that the trial court violated Rule 106, the court would have concluded that the error was harmless considering the strong proof of Harris's guilt and the fact that he was able to provide evidence and argument to the jury that he never intimidated Mr. Wilson (or another witness) or asked him to change his testimony.[33] *See United States v. Elonis*, 841 F.3d 589, 597−98 (3d Cir. 2016) (explaining that error is harmless if guilty verdict "was surely unattributable to the error").

---

[33] A couple of additional points are worth noting here. First, as the respondents point out in their brief in opposition to the habeas petition, reading Harris's testimony that he was not the type of person who would harm a witness, Harris potentially would have opened the door for the Commonwealth to introduce evidence of his propensity for violence. *See* Resp. at 17−18. Second, direct appellate counsel testified at the PCRA hearing that, if the trial court had permitted Harris to introduce the additional testimony he sought to have read into the record, the result of the trial would not have been different; instead, Harris "would have been convicted quicker." *See Harris III* at *8 (citation omitted).

Harris's second objection relating to Judge Lloret's prejudice analysis (and eighth objection overall) is an objection to Judge Lloret's statement that "the circumstances of all three witnesses' recantations, at various times suggest that those witnesses feared retaliation." Objs. at 6 (quoting R. & R. at 43). Harris asserts that Judge Lloret erred because the witnesses were not intimidated; instead, they simply did not want to testify to statements that were unsupported by the evidence at the crime scene. *See id.*

Harris's objection is meritless. In general, recantations are suspect. *See Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation testimony with great suspicion."); *Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997) ("Recantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof." (internal citations omitted)); *see also Dobbert v. Wainwright*, 468 U.S. 1231, 1233−34 (1984) (Brennan, J., dissenting) ("Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."). This is particularly true where the recantation amounts to perjury. *See Teagle v. Diguglielmo*, 336 F. App'x 209, 213 (3d Cir. 2009) ("Jett's affidavit recants his trial testimony, essentially admitting that the bulk of such testimony was perjury. Such suspicious and untrustworthy evidence does not, in the absence of additional corroborating evidence or circumstances, meet the standard of reliability contemplated by *Schlup*.").

While Harris argues that the evidence shows that the witnesses recanted their testimony simply because it did not match the evidence, the suspicious circumstances surrounding the recantations paint a different story. For example, Antwain Ball implicates Harris as the shooter in

34

his statement to the police. Then, Harris is in prison with Mr. Ball's brother, and they discuss their homicide cases. Mr. Ball then visits Harris at the prison, and when he testifies, his testimony differs from his statements to the police. Mr. Ball also testified differently during the third trial than he had in prior trials and, when confronted with these differences, claimed the recording of his testimony was inaccurate. N.T., Jan. 23, 2007, at 146, 159−60, 164−65, 170). As for Mr. Wilson, the court already discussed him having also met with Harris while incarcerated. After this meeting, Mr. Wilson's testimony changed from his police statement, with him claiming that he had lied to the police. Later, at the third trial, he took it a step farther and testified that he had never talked to the police. Based on these circumstances, it was reasonable to infer that the witnesses feared retaliation by testifying in accordance with their statements that Harris shot the victim from the hood of the vehicle.

Harris's third objection to the prejudice analysis is to Judge Lloret's suggestion that the jury could have also found that a fourth witness, Cherese Ball, put Harris on the roof of the car. *See* Objs. at 6; R. & R. at 46 n.33 ("I suggest that the jury also could have reasonably found that a fourth witness, Cherese Ball, who was called as a witness by Mr. Harris, also put Mr. Harris on the hood of the car, although like Antwain Ball and Marvin Wilson, not during her trial testimony. The Commonwealth established through the testimony of Detective Jerald Lynch that Ms. Ball also identified Mr. Harris, the "well dressed" man, as the shooter on the car's hood." (citing N.T., Jan. 25, 2007, at 182−85)). Although Harris recognizes that Ms. Ball gave a statement to police that "match[ed] her brothers[']", *i.e.* identified him as a shooter, Harris notes that she testified at trial that the police essentially told her what to say and she neither was present for the shooting nor could otherwise identify Harris. *See* Objs. at 6; N.T., Jan. 25, 2007, at 117−36.

The court also overrules this objection. The court understands Harris's complaint about Judge Lloret's suggestion given Ms. Ball's trial testimony, but all Judge Lloret was pointing out was that there was another witness who potentially placed Harris on the hood of the car shooting at the decedent, and the jury could have, despite Ms. Ball's testimony, considered her contradictory statement to the police, which was put before the jury through a police detective's testimony. *See* N.T., Jan. 25, 2007, at pp. 182–85. As this was just a suggestion by Judge Lloret, the court overrules the objection.

Harris's final objection to the prejudice analysis (and tenth objection overall) is one to Judge Lloret's finding that he managed to "put before the jury the very evidence[, *i.e.* evidence that he did not intimidate Mr. Wilson or other witnesses] he suggests he was denied by [the trial judge's] ruling." Objs. at 7. He does not believe that this "cure[d]" the trial judge's error. *See id.* He claims that

> [h]ad the jury heard the entire testimony, the jury would've known exactly why the phrase, "looked scared", was used and the prosecutor wouldn't been [sic] able to make it seems as though the phrase was used to intimidate the witness into not testifying to a statement that never made any sense. The judge's ruling allowed the prosecutor to add the element of witness intimidation that petitioner had to defend himself against.

> Petitioner tried to explain to the judge that the prosecutor was trying to make it seem like petitioner was intimidating the witness, the judge cut petitioner off and stated, the prosecutor was making a "strategic decision, n.t. 1/26/07 at 23. The prosecutor's strategic decision was to take this case and make it about witnesses being tampered, to disguise the statements and testimony of the prosecution witnesses. Petitioner didn't only have to defend himself against the charge of murder, he also had to explain that he didn't do anything to make the witnesses not testify to statements that never matched the crime scene.

*Id.*

The court also overrules this objection. As already discussed, the single passage of testimony that Harris sought to introduce would not have addressed his own perception that Mr.

Wilson looked scared upon seeing him. Moreover, even if the trial court erred in failing to allow Harris to read this additional passage into the record, any such error was harmless because Harris directly asked Mr. Wilson if he had intimidated him, and Mr. Wilson testified that he had not. Mr. Wilson even went beyond that and said that he had never seen Harris before in his life. Further, Harris was able to argue to the jury that he never intimidated anyone. Therefore, any error was harmless, and Harris has not been able to show that he was prejudiced by any possible error by direct appellate counsel.

### 2.      Objections to Prosecutorial Misconduct Determination

Harris also poses two objections to Judge Lloret's analysis of his prosecutorial misconduct claim. *See* Objs. at 8. The court will address each in turn.

#### a.      <u>First Objection</u>

For his first objection, Harris asserts that Judge Lloret only addressed part of the issue that he presented relating to his claim of prosecutorial misconduct. *See id.* He claims that both Judge Lloret and the Superior Court erred by focusing on an objection to only one portion of the argument, when in fact he "objected to the argument as a whole." *Id.*

This objection is overruled because Harris never objected to the prosecutor's closing argument "as a whole." This court has reviewed the entirety of the prosecutor's closing argument, and Harris's objected to only the following portions of the argument:

> [Prosecutor:]  . . . I was just outside the courtroom five minutes ago, looking at today's, the cover of the Daily News. It has all these headlines about people being shot and murdered and killed in Iraq. The one thing about --
>
> [Harris:]      Objection.
>
> [The Court:]   Overruled.
>
> . . .

| [Prosecutor:] | The bottom line with the case is, you heard his version of events in this case through those notes of testimony. That is that he was having a war with some other guys out there on the streets of Philadelphia in which they shot one of these guys. |
|---|---|
| [Harris:] | Objection, Your Honor. |
| [The Court:] | Overruled. |

. . .

| [Prosecutor:] | And when the defendant chose to represent himself and to act as his own attorney, he has to bear the consequences of it. And he filed a document in this case. And whenever a lawyer, whether you are representing yourself or somebody else, files a document, you are agreeing that the facts in that petition are what is true. |
| | |
| | And I want you to look at this. It was filed by this defendant: "I, Jonathan F. Harris, hereby certify that all the information --" |
| [Harris:] | Objection. |
| [The Court:] | Overruled. |

. . .

| [Prosecutor:] | And who does everybody else agree the one person who was dressed up that night, is this defendant. And I want to think about the one person who was dressed up that night, is this defendant. And I want you to think about that because that is part of what is going on in this courtroom. |
| | |
| | Why do you think the defendant is in this courtroom dressed in like a flannel shirt, and boots and blue jeans? Is he trying to put on a little show and act like you folks here? |
| [Harris:] | Objection. |
| [The Court:] | Overruled. |

. . .

| [Prosecutor:] | What is the term? Snitches get stitches. The words get around the 'hood, you talk to the police, people are coming up to you, showing you statements -- |

[Harris:]        Objection, Your Honor.

[The Court:]     Overruled.

. . .

[Prosecutor:]    But the bottom line with the case, it is time to stop. It is time to tell
                 the defendant, you can make phone calls on your illegal cell phone
                 from prison and talk to the witnesses. You can walk up to them in
                 the jail and say what are you doing giving statements on me. You
                 can send that statement out there to scare off the people.

                 But don't you folks be the same way. Don't let him reach out to you,
                 because that is what the defense in this case is. He is standing here.
                 I'm a plain simple man, just like you and me. I don't have a lawyer,
                 I can't afford, I don't have my own experts.

                 He is trying to put on an act --

[Harris:]        Objection.

[The Court:]     Overruled.

N.T., Jan. 26, 2007 at pp. 147−48, 172−73, 180−81, 184, 189−90. As demonstrated here, at no

point did Harris object to the entirety of the prosecutor's closing argument.

Further, after the prosecutor's closing and the trial court's remarks to the jury in which the

trial court asked the jurors to convene and inform the court whether they wanted to stop for the

day, the trial court provided Harris with the opportunity to be heard with respect to any objections

he made during the closing argument. *See id.* at 190−94. Harris then described his objections to

the prosecutor's closing as follows:

        I want to first object about what he said, war in Iraq, and he said young men are
        being killed in the streets every day in Philadelphia. That is the first objection I am
        objecting to.

                And he said then also, I am objecting when he said, when you use this
        document, Your Honor, and he said this is enough to find me guilty for this
        document, where this is the document from the bail motion, Your Honor. And it is

only the charges -- it is only where the charges came from. I never admitted to this
in no kind of way. I never made a statement saying I was admitting to this.

And also I want to object to where he said that defendant is dressed in boots
and slacks, trying to make you think he is one of y'all. And where he also said
snitches get stiches, and where he said I don't have my own expert. I never testified
to that about me not having my own expert, Your Honor.

And he said about -- the defendant said I was having a war. Never came up
about me having a war.

And, Your Honor, one more thing for the record, I move for mistrial for all
those reasons.

N.T., Jan. 26, 2007, at 194−95.

Once again, at no point during his recitation of his objections does Harris indicate that he

is objecting to the entirety of the prosecutor's closing argument. Therefore, the record contradicts

any argument by Harris that he objected to anything beyond the objections referenced above, none

of which were an objection to the whole closing argument.

The court also notes that Harris references his supporting memorandum of law and his

"traverse" in support of his claim that his prosecutorial misconduct claim was broader than

represented by the Superior Court and Judge Lloret. *See* Objs. at 8 (citing Mem. of Law and Facts

Supporting Writ of Habeas Corpus at pp. 17−18, Doc. No. 1; Pet'r's Traverse to Resp. to Order to

Show Cause at pp. 24−28, Doc. No. 20). To the extent that Harris is contending that these

arguments preserved any argument relating to other objections to the closing argument, he is

mistaken because any habeas claims based on other objections are procedurally defaulted.

As illustrated by Harris's appellate brief, his only argument relating to prosecutorial

misconduct during the prosecutor's closing argument was when "the prosecutor likened the war in

Iraq to the streets of Philadelphia and the defendant a Muslim. The prosecutor further broadcast

that young men are being killed on the streets everyday [sic] in Philadelphia and the appellant was

having a war." Appellate Br. at p. 23. In addressing this argument, the Superior Court accurately noted that the argument was "wholly unaccompanied by citation to the certified record." *Harris I* at 398 (citation omitted). Yet, rather than finding this issue waived, the Superior Court referred to Harris's recusal argument earlier in his brief, where Harris referred to the prosecutor's comments about the streets of Philadelphia and the war in Iraq. *See id.* The Superior Court then considered whether this statement during the closing constituted prosecutorial misconduct. *See id.* The Superior Court properly explained that Harris had only objected to one instance of the prosecutor referencing the murder rate in Philadelphia during his closing argument, and concluded that "it alone, in the context of the case as a whole, does not amount to prosecutorial misconduct requiring a new trial." *See id.*

The record before the Superior Court demonstrates that Harris exhausted one objection to the prosecutor's statement, the one where the prosecutor references the streets of Philadelphia and the war in Iraq. *See* N.T., Jan. 26, 2007, at 147−48. The only other objection he included in his brief was a reference to the prosecutor's statement about Harris having a war with other guys on the streets of Philadelphia. *See* Appellate Br. at 23; N.T., Jan. 26, 2007, at 172. The Superior Court did not consider this argument because direct appellate counsel did not include a citation to the transcript in the appellate brief, as required by Rule 2119(c) of the Pennsylvania Rules of Appellate Procedure. At bottom, any habeas claim relating to an objection to a portion of the prosecutor's closing argument, other than the single objection mentioned above, is procedurally defaulted. *See, e.g.*, *Saunders v. Mahally*, Civ. A. No. 16-cv-2690, 2016 WL 11267192, at *5 n.6 (E.D. Pa. Dec. 29, 2016) (finding habeas petitioner's prosecutorial misconduct claim to be unexhausted despite being mentioned in Pennsylvania Rule of Appellate Procedure 1925(b) statement because it was not raised in petitioner's appellate brief before Superior Court).

Harris has not even attempted to argue cause for the procedural default and actual prejudice arising therefrom, or that a fundamental miscarriage of justice will result if the claim is not considered. He also has not asserted that direct appellate counsel was ineffective for failing to include his other objections to the closing argument which would raise a claim under *Martinez v. Ryan*, 566 U.S. 1 (2012).[34] Accordingly, any claim relating to any other objection to the prosecutor's argument is procedurally defaulted and unreviewable as part of this habeas proceeding.

b.    Second Objection

Harris's second objection to Judge Lloret's prosecutorial misconduct analysis (and his final objection overall) appears to be a general objection to Judge Lloret's conclusion that the Superior Court's determination that Harris's prosecutorial misconduct claim was meritless was a reasonable applicable of federal law. *See* Objs. at 8 (citing R. & R. at 50). He disagrees with Judge Lloret's conclusion because

> [t]he comments by the prosecutor were only made to appeal to the jurors [sic] sense of outrage regarding the increasing violent nature of our society. There was no evidence about people being killed in Iraq, or the amount of people being killed in Philadelphia. The remarks were improper because they injected issues broader than guilt or innocence of the accused.

---

[34] In *Martinez*, the Supreme Court held that a defendant in a state law criminal case can establish cause for procedural default of a claim of ineffective assistance of trial counsel by showing that there was ineffective assistance at the initial-review collateral proceeding, which in the case of a Pennsylvania state conviction would mean at the PCRA level. 566 U.S. at 9. To qualify, the Court required that the ineffective assistance of counsel claim be a substantial one, which means the claim must have some merit. *Id.* at 17–18.

Even if Harris had asserted a *Martinez* claim relating to direct appellate counsel waiving his objection to the prosecutor's statement during his closing that Harris was having a war with some other guys on the streets of Philadelphia, it would not excuse the procedural default because he could not show that direct appellate counsel was ineffective for failing to preserve the claim insofar as he cannot show prejudice.

To establish a claim of prosecutorial misconduct and overturn a conviction, the prosecutor's conduct must have "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Here, if direct appellate counsel had properly cited to the transcript when referencing the prosecutor's argument about Harris being in a war with others on the streets of Philadelphia, the prosecutor's statement, alone, did not so infect the trial with unfairness as to make Harris's resulting conviction a denial of due process.

42

*Id.* He also notes that the trial court did not offer any curative instruction to this closing argument. *See id.*

Harris's objection is overruled. Contrary to Harris's assertion, there is no indication by reviewing the prosecutor's statements that he was attempting to appeal to the "jurors['] sense of outrage regarding the increasing violent nature of our society." Instead, as Judge Lloret noted, the prosecutor, who (along with the jury) had just sat through over two hours of closing argument by Harris, started his closing argument by attempting to ask the jurors to maintain their attention for a while longer. *See* R. & R. at 50. Judge Lloret explained that

> [i]n explaining why their attention was warranted, the prosecutor referenced two places on [E]arth where people were currently losing their lives, Iraq, and the streets of Philadelphia. He suggested that this loss of life was a serious matter, and, because the case they just heard concerned the loss of a young man's life in Philadelphia, the case was important, deserving their close attention. Once these introductory remarks were finished, presumably focusing the jury's attention, the prosecutor immediately pivoted to the law and facts of the case before them.

*Id.*

After summarizing the prosecutor's statements at issue, Judge Lloret appropriately determined that "[t]he passing comments made by the prosecutor in his introduction to a thorough, and proper, discussion of the facts of the case and the applicable law, do not constitute prosecutorial misconduct." *Id.* at 51. He also properly noted that when examining a claim of prosecutorial misconduct, "the appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate defendant's due process rights." *Id.* (quoting *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982)). Judge Lloret also concluded that the

review of the entire record, "unequivocally supports" the Superior Court's determination that Harris's prosecutorial misconduct claim was without merit.[35]

The court agrees with and incorporates Judge Lloret's characterization of the prosecutor's comments, his analysis of those comments, and his ultimate determination that the Superior Court did not unreasonably apply federal law in concluding that Harris's prosecutorial misconduct claim was meritless. This court cannot say that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Accordingly, Harris's objection is overruled.

### III.   CONCLUSION

For the reasons set forth above, the court agrees with Judge Lloret that the court should deny Harris's petition for a writ of habeas corpus, as amended. Therefore, the court overrules Harris's objections. The court also declines to issue a certificate of appealability.[36]

The court will enter a separate order.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[35] The Superior Court had also pointed out that Harris "never actually assert[ed] that [the prosecutor's remarks] prejudiced the jurors, or that it rendered them incapable of weighing the evidence objectively and rendering a true verdict." *Harris*, 979 A.2d at 399.

[36] A court should only issue a certificate of appealability if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits ... [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, Harris has not made a substantial showing of the denial of a constitutional right insofar as he has not demonstrated that reasonable jurists would find this court's assessment of the constitutional claims debatable or wrong.